## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| R. R. DONNELLEY & SONS COMPANY, <br><br> and <br><br> COURIER NEW MEDIA, INC., <br><br> Plaintiffs, <br><br> v. <br><br> ALEXANDER NADOLINSKI, <br><br> and <br><br> NADLAB, LLC, <br><br> Defendants. | Civil Action No. <br><br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiffs R. R. Donnelley & Sons Company ("RRD") and Courier New Media, Inc. ("Courier" and collectively with RRD, "Plaintiffs"), by and through their attorneys, Ropes & Gray LLP, assert the following causes of action against Defendants Alexander Nadolinski and NadLab, LLC (collectively, "Defendants"). In support of their claims, Plaintiffs aver the following, all upon their most recent knowledge, information and reasonable belief:

## THE PARTIES

1.      Plaintiff RRD is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 35 West Wacker Drive Chicago, Illinois 60601. RRD is a leading provider of communication services in the United States and globally, working with its customers to create, manage, produce, distribute, and process content, and

develop effective multichannel communication strategies.  RRD is a Fortune 500 company that employs over 65,000 people worldwide.

2.      Plaintiff Courier is a corporation organized and existing under the laws of the Commonwealth of Massachusetts, having its principal place of business at 15 Wellman Avenue, North Chelmsford, Massachusetts 01863.  Courier is a wholly-owned subsidiary of RRD. Courier provides software, custom and on-demand print manufacturing, product assembly, publishing, and distribution services.

3.      Defendant Alexander Nadolinski ("Nadolinski") is an individual residing at 12 Wendell St. #17 Cambridge, Massachusetts 02138.  He is the founder and General Manager of NadLab, LLC.

4.      Defendant NadLab, LLC ("NadLab") is a limited liability company organized under the laws of the State of Delaware, having its principal place of business at 800 St. Mary's Street, Suite 34, Raleigh, North Carolina 27605 and additional offices at 30 Newbury Street, 3rd Floor, Boston, Massachusetts 02116.

## NATURE OF THE ACTION

5.      This case involves Defendants' misappropriation of Plaintiffs' trade secrets and other confidential and proprietary business information, including but not limited to valuable and proprietary source code used to develop a unique Custom Publishing Platform (also the "Platform") for creating customized textbooks.

6.      Using the Platform, custom textbooks are created by quickly and easily assembling materials from disparate sources and are then distributed in various print or electronic formats.  This innovative product allows professors, instructors, and other individuals to create textbooks specifically tailored to the particular needs of a class or group of students.

7.      Plaintiffs and their predecessors in interest have spent millions of dollars on the development and maintenance of the Platform.  Over the last five years, a team of approximately 10 full time employees have been working on the Platform's continued development and maintenance.  Through this investment, Plaintiffs maintain their competitive advantage by developing the most effective and secure software, systems, and procedures in the custom printing industry.

8.      The Custom Publishing Platform has been extremely successful, garnering many millions in revenue from 2013 through 2015.  This success contributed to Courier's acquisition by Plaintiff RRD last year for over $260 million.

9.      Plaintiffs' success in the marketplace is the direct result of their significant, and expensive, product development efforts.  To maintain their competitive advantage, Plaintiffs have developed and refined cutting-edge source code to operate the Custom Publishing Platform. Plaintiffs have gone to great lengths to keep their most valuable assets—software source code— secret.  Software is kept in a secure repository, located behind a firewall, and individuals are allowed access only with private passwords provided to each engineer working on the source code.  Employees are subject to confidentiality obligations prohibiting any disclosure or misuse of confidential information.

10.     Recently, Plaintiffs were alerted to the possibility that their trade secrets and other confidential and proprietary business information (collectively, the "Protected Business Information") had been stolen.  Specifically, the Protected Business Information includes the Platform's highly confidential server-side source code and database structure (collectively "Platform Core Data"), which constitute Plaintiffs' valuable trade secrets.  Plaintiffs promptly investigated.  Over the last several weeks, Plaintiffs uncovered information indicating that their

Custom Publishing Platform had been taken by Defendants and was being offered by them to Plaintiffs' direct competitor as well as other third parties.

11.     Defendant Nadolinski, along with his company, Defendant NadLab, worked for Courier and its predecessor for years.  Defendant Nadolinski and his NadLab team were responsible for developing the source code for the Custom Publishing Platform, among other responsibilities.  Ultimately, Defendant Nadolinski became Courier's Technical Director.  In this role, Defendants had access to Courier's confidential, proprietary, and trade secret information, including the highly confidential source code related to the Platform that is at issue in this action. Under the terms of Defendants' employment agreements, Courier was the exclusive owner of all rights in and to the source code and the Platform.

12.     The shocking results of Plaintiffs' investigation to date have shown that Defendant Nadolinski stole at least 1.7 terabytes of electronic data (approximately 300,000 files) containing Plaintiffs' Protected Business Information.  Further, Defendants have used the Protected Business Information to directly compete against Plaintiffs in the marketplace by copying it and demonstrating and offering for sale to Plaintiffs' competitor and other third parties software products which use the Protected Business Information.  This case arises from that theft, misappropriation, and unauthorized use of Plaintiffs' Protected Business Information, as well as the Defendants' breach of their employment agreements in so doing.

13.     Defendant Nadolinski engaged in unlawful conduct over an extended period of time, some of which occurred while Defendant Nadolinski remained employed by Courier, and some of which occurred after he left Courier and which continues to this day.

14.     Prior to the end of his employment with Courier in January 2015, Defendant Nadolinski improperly accessed, copied, removed, and/or retained Courier's Protected Business

Information for his own use and for the use of his software development company, Defendant NadLab.

15.     On multiple occasions since leaving Courier, Defendant Nadolinski has contacted a direct competitor of Plaintiffs, Quad/Graphics, Inc. ("Quad/Graphics"), and engaged in discussions to demonstrate and offer to them a custom publishing platform that is based on, utilizes, and copies the Protected Business Information, including Platform Core Data.  To this day, Defendant Nadolinski is actively undertaking to offer for sale the stolen information to Quad/Graphics and other third parties.

16.     Defendants' actions complained of herein were undertaken knowingly, willfully, and maliciously.  Indeed, Defendant Nadolinski has acknowledged that Plaintiff RRD could and would seek legal action against him if his wrongdoing was discovered.  Specifically, he admitted that modifications were required to his stolen software platform to conceal the resemblance to Plaintiffs' original before he could demonstrate it to one of Plaintiffs' key customers: "need to do 2 things. . . . Modifications of C[ustom]P[ublishing] for Pearson.  ***Otherwise RRD can sue and stop a lot of things***" (emphasis added).

17.     Defendants' conduct complained of herein has been undertaken for the purpose of growing the business of Defendant NadLab and aiding Plaintiffs' competitors, all while Defendants profit from this unlawful scheme.

18.     Plaintiffs were forced to expend considerable effort and resources, including a factual investigation, interviews, and a forensic computer analysis, in order to discover and obtain evidence of Defendants' wrongdoings and continuing wrongful actions.

19.     In undertaking actions to copy and steal Plaintiffs' Protected Business Information, including their Custom Publishing Platform, then use it to grow the business of

Defendant NadLab, offer it to Plaintiffs' competitor and other third parties, and otherwise use it for their own benefit, Defendants have violated numerous civil laws including misappropriation of trade secrets under the Defend Trade Secrets Act, 18 U.S.C. §§ 1836, *et seq.*, Massachusetts General Laws Chapter 93, § 42, and Massachusetts common law; unfair competition under Massachusetts General Laws Chapter 93A; interference with advantageous business relationships under Massachusetts common law; breach of contract under Massachusetts common law; and breach of the covenant of good faith and fair dealing under Massachusetts common law.

20.     Defendants' conduct has caused and continues to cause Plaintiffs great financial harm and immediate irreparable injury as a result of the loss of the confidentiality of their Protected Business Information, ongoing and threatened loss of business and customers, and loss of goodwill and reputation.

21.     Plaintiffs seek declaratory relief, preliminary and permanent injunctive relief, actual, statutory, punitive, and enhanced damages against Defendants, and the return of Plaintiffs' stolen Protected Business Information.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over the federal claims in this action that arise under the Defend Trade Secrets Act, 18 U.S.C. §§ 1836, *et seq.,* pursuant to 28 U.S.C. § 1331.  This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

23.     This Court has personal jurisdiction over Defendants, which reside or have a place of business in this District, and have significant contacts with and do business in this District.

24.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because

Defendants reside or may be found in this District, a substantial portion of the events or

omissions giving rise to Plaintiffs' claims occurred within this district, and significant witnesses,

documents, and other evidence are located within this district.

## FACTS COMMON TO ALL COUNTS

### *The RRD/Courier/Highcrest Companies and the Customized Textbook Business*

25.     In January 2010, Courier acquired Highcrest Media LLC ("Highcrest"), a

Massachusetts-based provider of software used to streamline the production of customized

textbooks.

26.     In part through this acquisition of Highcrest, Courier became a market leader in

content management and customization of new and traditional media, including offering

customized textbook products for use in higher education and businesses.

27.     The market for custom textbook publishing has grown at double-digit rates in

recent years, and it is a segment of the market that is anticipated to continue to grow at similar

rates in the foreseeable future.

28.     On June 8, 2015, RRD completed its acquisition of Courier's parent company for

$261 million, with an aim to increase its market presence in this fast-growing custom book

industry.  Plaintiffs' innovative custom and on-demand print manufacturing, publishing, and

distribution product enables a user to create, at low cost, unique textbooks specifically tailored to

the particular needs of the individual.

29.     Together, Plaintiffs and their predecessors-in-interest have invested millions of

dollars developing and maintaining the Custom Publishing Platform and protecting their

inventions and other proprietary information.

30.     Plaintiffs' Protected Business Information, including Platform Core Data, relate to their custom and on-demand print manufacturing, product assembly, publishing, and distribution services. These services are used in interstate and foreign commerce.

31.     Plaintiffs RRD and Courier each have taken considerable measures to protect their trade secret information, including by, *inter alia*, carefully limiting access to this information.

32.     Prior to its acquisition by Plaintiff RRD, Courier kept its software in a secure repository, located behind a firewall.  Access to the relevant servers was limited to those engineers or managers working on relevant projects who were provided with the relevant access password.  Engineers with access are subject to confidentiality obligations limiting use and disclosure of this information.

33.     Since the acquisition of Courier, Plaintiffs have kept their software in a secure repository, located behind a firewall.  Individuals are allowed access only with private passwords provided to each engineer working on the source code.  Access to the server is limited to only those IP addresses that belong to engineers or managers who work on relevant projects.  Engineers with access are subject to confidentiality obligations limiting use and disclosure of this information.

### *Defendants and Their Unlawful Conduct*

34.     Defendant NadLab was founded in 2006 by Defendant Nadolinski.  According to its website, NadLab is "a software research and development company."

35.     Defendant Nadolinski is a former Courier employee.  Defendants Nadolinski and NadLab were first hired by Highcrest in January 2008 as software development contractors to create and maintain a custom publishing and content management system.

36.     On January 1, 2008, Defendant NadLab, by and through its President, Defendant Nadolinski, entered into an "Employment/Subcontractor Agreement" with Highcrest (hereinafter "Subcontractor Agreement") under which Highcrest would own the copyrights to all work NadLab performed thereunder.  NadLab further agreed that it would use Highcrest's confidential information solely for work performed for Highcrest, and not for any other purpose, and would not disclose the confidential information to any one other than Highcrest.

37.     The Subcontractor Agreement further provided that upon termination of the agreement, NadLab would return all confidential information in tangible form, destroy all written confidential information, and continue to protect any remaining confidential information pursuant to the agreement's continuing confidentiality obligations.

38.     After Courier acquired Highcrest in 2010, Defendants Nadolinski and NadLab continued providing software services to Courier.  On January 15, 2010, they executed an amendment to the Subcontractor Agreement in connection with the acquisition (hereinafter "Subcontractor Amendment").

39.     By the terms of the Subcontractor Amendment, Defendants agreed and acknowledged that Courier was entitled to ownership of the intellectual property created by NadLab pursuant to the Subcontractor Agreement.

40.     In April 2013, Defendant Nadolinski was offered the position of Courier's Technical Director, reporting directly to Courier's Vice President, Michael Shea.  This offer of employment was conditional on execution of an "Employee Confidentiality and Assignment Agreement" (hereinafter "Employee Confidentiality Agreement") and "Assignment of Intellectual Property and Release" (hereinafter "IP Assignment").

41.     On or around April 25, 2013, Defendant NadLab, by and through Defendant Nadolinski, executed the IP Assignment, under which NadLab conveyed "**all right, title and interest in certain copyrights, software programs and intellectual property**" it owned to Courier.  (emphasis added).  In addition, the IP Assignment terminated the earlier Subcontractor Agreement.

42.     On or around April 30, 2013, Defendant Nadolinski entered into the Employee Confidentiality Agreement, under which he agreed that, *inter alia*,

> **all information**, whether or not in writing, **concerning [Courier's] business, technology, business relationships or financial affairs** that [Courier] has not released to the general public (collectively, "Proprietary Information") **has been, is and will be the exclusive property of [Courier]**.  By way of illustration, Proprietary Information may include . . . *operational and technological information*, including . . . software, designs, methods, procedures, formulas, discoveries, inventions, improvements, concepts and ideas . . . .

(bold emphasis added).  Defendant Nadolinski was further bound by these strict confidentiality and non-disclosure obligations not to disclose any such information during or after his employment to anyone outside of Courier.

43.     By the terms of the Employee Confidentiality Agreement, Courier owned all rights to any intellectual property or work Nadolinski performed or developed, or that was developed under his direction, during the period of his employment.  The Employee Confidentiality Agreement, further provided that Defendant Nadolinski would:

> set forth on Exhibit A attached hereto a complete list of Developments that I have, alone or jointly with others, conceived, developed or reduced to practice prior to the commencement of my employment with the Company [Courier] that I consider to be my property or the property of third parties and that I wish to have excluded from the scope of this Agreement . . . .

Defendant Nadolinski did not list any such inventions or "Developments" on Exhibit A or elsewhere.

44.     Defendant Nadolinski further agreed that:

In order to protect the Company's Proprietary Information and good will, during my employment and for a period of one year thereafter (the "Restricted Period"), **I will not directly or indirectly**, whether as owner, partner, shareholder, director, manager, consultant, agent, employee, co-venturer or otherwise, **engage, participate or invest in any business activity** anywhere in the United States **that develops, manufactures or markets any products, or performs any services, that are otherwise competitive with or similar to the products or services of the Company**, or products or services that the Company or its affiliates, has under development or that are the subject of active planning at any time during my employment . . . .

(bold emphasis added).

45.     In his position as Courier's Technical Director, Defendant Nadolinski's responsibilities included developing and overseeing the development of various software programs and platforms for the company.  Defendant Nadolinski and his NadLab team worked on the underlying source code for, *inter alia*, the Custom Publishing Platform.  He had extensive access to the Protected Business Information, including the Platform Core Data.  As Technical Director, Mr. Nadolinski was intimately involved in Courier's software development and responsible in part for maintaining the access to Courier's confidential source code.

46.     Plaintiffs license their Custom Publishing Platform to their customers, such as Pearson Education, Inc. ("Pearson"), with whom Plaintiffs have established relationships to develop and provide customized technology platforms without revealing Plaintiffs' highly confidential Platform Core Data.  This relationship has led to lucrative contracts to create eLearning sites such as the Pearson Custom Library ("PCL") (http://www.pearsoncustomlibrary.com/).

47.     Plaintiffs' investigation has revealed that, while employed by Courier, in or about October 2013, in willful breach of the Employee Confidentiality Agreement, Defendant Nadolinski became a shareholder of Isaak Books, Inc. ("Isaak").  According to its Shareholders

Agreement, Isaak offers, *inter alia*, "Digital Content," "Publishing/Authoring platforms," and

"Publishing of Professor/Student books" to educational institutions.  Defendants worked to

develop software and software strategy for Isaak's customers and purported to transfer from

NadLab to Isaak "digital applications (Intellectual Property) provided to educational markets and

Isaak clients."

48.     On January 13, 2015, Defendant Nadolinski resigned his position at Courier.  At

that point, per the terms of the Employee Confidentiality Agreement, Mr. Nadolinski was under

an obligation to return any and all confidential and proprietary information to Courier, as well as

a continuing obligation not to use or disclose Courier's confidential and proprietary information.

By the terms of the January 13, 2015 resignation letter that Defendant Nadolinski signed on

behalf of himself and Defendant NadLab ("Resignation Letter Agreement"), Defendants

"agree[d] to cooperate and use commercially reasonable efforts to transition any servers, code,

documentation and related materials to Courier IT staff . . . ."

49.     Plaintiffs' investigation has revealed that, at or before the conclusion of his

employment with Courier, however, Defendant Nadolinski improperly accessed, copied,

removed, and/or retained Courier's Protected Business Information, including countless digital

files and highly confidential Platform Core Data.  Defendant Nadolinski copied and used that

Protected Business Information to develop, demonstrate, and offer for sale software products to

Plaintiffs' competitors and other third parties, such as Quad/Graphics and Cengage Publishing in

late 2015 and in 2016.

50.     Plaintiffs' investigation has revealed that, on September 4, 2015, Quad/Graphics

corresponded with Defendant Nadolinski requesting a "Build a Book" platform for professors to

customize and "build a course book," specifying that Quad/Graphics "want[s] to move on this fairly quickly if possible."

51.    On September 23, 2015, Defendant Nadolinski contacted Quad/Graphics on behalf of Isaak and offered to "demo" a custom publishing platform called "Publish With Us," describing Isaak as "a startup company which is focused on custom publishing for universities." Over the ensuing months, Defendants had various meetings with Quad/Graphics concerning custom publishing.

52.    Beginning in or about January and February 2016, while he served as Isaak's shareholder and Chief Information Officer, Defendant Nadolinski stored Plaintiffs' stolen Protected Business Information on Isaak's cloud computing storage platform hosted by Microsoft Azure (the "Azure account").  The Protected Business Information stored on the Azure account is estimated to comprise at least 1.7 terabytes of electronic data and consist of approximately 300,000 files.

53.    In or about February 2016, Isaak began planning a meeting with Pearson to discuss and demonstrate the "Publish With Us" custom publishing platform it had received from Defendants.  Realizing that Pearson would recognize it as based on the Protected Business Information, Defendant Nadolinski insisted that the meeting be pushed back to accommodate further development of a second iteration of "Publish with Us," "Textfuser," to demonstrate to Pearson instead.

54.    On or about February 5, 2016, Defendant Nadolinski admitted to his then-business partner that the reason he needed time before the Pearson meeting was to obfuscate the identity of the website and prevent Plaintiff RRD from discovering his wrongful conduct: "need

to do 2 things . . . Modifications of C[ustom]P[ublishing] for Pearson. ***Otherwise RRD can sue and stop a lot of things***" (emphasis added).

55.     In or about March 2016, representatives from Isaak, including Defendant Nadolinski, had a meeting with representatives from Pearson, but Isaak did not demonstrate the "Publish With Us" or "Textfuser" platforms to Pearson at that time.

56.     On or about March and April 2016, Defendants deepened their relationship with high-level officers of Quad/Graphics through additional meetings.  During these meetings with Quad/Graphics, Defendant Nadolinski "**discussed a lot about [his] work at Courier**," (emphasis added) entered into contracts, and explored the possibility of a joint venture.

57.     On or about March 30, 2016, Defendant Nadolinski quit his position at Isaak and reverted his shares to the company.  Shortly thereafter, Isaak experienced repeated unauthorized access to its business accounts, including the Azure account.  Isaak responded to this unauthorized access by freezing all access to its Azure account to prevent further unauthorized attempts at remote access.

58.     In or about May 2016, Isaak regained access to its Azure account and soon thereafter discovered the presence of at least 1.7 terabytes of Plaintiffs' Protected Business Information relating to the PCL stored there by Defendant Nadolinski.  By way of example, among the electronic data on the Azure account is a storage space bearing the name "pclmigratedhidden,"[1] containing approximately 300,000 files.  The file paths for files contained in the "pclmigratedhidden" container include, *inter alia*, "\PCLfiles_pearsonlabs"; "\PCLfiles_physicsandastronomy"; and "\PCLfiles_politics."  Within the "pclmigratedhidden"

---

[1] On information and belief, "pclmigratedhidden" is shorthand for "Pearson Custom Library Migrated Hidden."

container are individual files bearing such names as "PearsonBookReader.zip";

"M04_PEAR6521_01_TE_U02_PCL.pdf"; and "M01_PEAR1350_01_SE_C01_PCL.pdf."

59.     Plaintiffs' investigation has revealed that Defendants used the Protected Business

Information, including Platform Core Data, in the design and development of competing

software platforms.  In particular, Defendants created multiple platforms and test websites for

custom publishing, including "Publish With Us" (publishwithus.com) and "Textfuser"

(textfuser.com).  Defendants also created the "Pragmatic Book" (pragmaticbook.net) website, a

Russian-language version of the platform, which is hosted on the same server as one other

website, the "Textfuser" website.  These custom publishing platforms bear a striking

resemblance to the PCL platform.

60.     Plaintiffs' investigation has shown that, in creating the "Publish With Us,"

"Textfuser," and "Pragmatic Book" platforms, Defendants copied and used the Protected

Business information, including Platform Core Data, as evidenced by the browser-side code for

the "Textfuser" and "Pragmatic Book" websites, which each contain references to Plaintiffs'

clients, including, *inter alia*, the "Pearson Custom Business Resources library" and "Pearson

textbooks."  As further evidence of the copying, the browser-side code to Defendants' websites

even contains the exact same typographical errors that appear in the PCL code.  In order to

implement the Platform on their websites, Defendants would also need the server-side code to

PCL, which constitutes Platform Core Data and Plaintiffs' trade secrets.

61.     Plaintiffs' investigation has revealed that, as of June 9, 2016, the "Publish With

Us" website is not currently operational.

62.     Plaintiffs' investigation has revealed that, as of June 17, 2016, the "Textfuser"

website appeared fully operational and could be used to build a custom book.  Screenshots from

the "Textfuser" website captured by the Internet Archive Wayback Machine from February 2011, while Defendant Nadolinski was a Courier employee, show that it previously redirected traffic to Pearson's website.  The following is a true and correct copy of a screenshot of the Internet Archive Wayback Machine website capture of textfuser.com:



63.     Multiple documents available for download from textfuser.com are identical to documents in the pclmigratedhidden container on Isaak Books' Azure account.

64.     Plaintiffs' investigation has shown that, as of June 9, 2016, the "Pragmatic Book" website, the Russian-language website, appeared operational.  Screenshots from the "Pragmatic Book" website captured by the Internet Archive Wayback Machine show that it previously displayed Pearson's logo and PCL content in English. The following is a true and correct copy of a screenshot of the Internet Archive Wayback Machine website capture of pragmaticbook.net:



65.     A certified translation of the website text at pragmaticbook.net as it appeared on

June 8, 2016 reveals that the Russian text is the same as the content from the PCL page, but has

simply been translated into Russian.  The bottom of the page purports to provide notice of a 2016

copyright in the material by the Ministry of Defense of the Russian Federation.  The following is

a true and correct copy of a certified translation of the pragmaticbook.net website:



66.     Plaintiffs' investigation into Defendants' wrongdoing has indicated that Defendant Nadolinski improperly accessed, copied, removed, and/or retained many thousands of files of Protected Business Information and has provided and offered to sell the Protected Business Information to Plaintiffs' competitors and other third parties on multiple occasions, as detailed above.  Plaintiffs' investigation continues to uncover new information showing Defendants' past and ongoing unlawful acts that threaten Plaintiffs' business.

67.     As established above, Defendants have violated their obligations to return any and all of the Protected Business Information to Courier and not to use or disclose the Protected Business Information to anyone outside of Courier under the Subcontractor Agreement, Subcontractor Amendment, IP Assignment, Employee Confidentiality Agreement, and/or

Resignation Letter Agreement (the "Employment Agreements"), and have violated numerous statutes and the rights of Plaintiffs, as set forth above and in the Counts of this Complaint, below.

68.     Plaintiffs are exclusively entitled to the benefit of the Protected Business Information, which they developed over many years, and which Defendants copied, stole, and utilized for their own benefit and to the detriment of Plaintiffs.

69.     Defendants' conduct has caused Plaintiffs to suffer an amount of damages to be determined and has deprived and/or threatens to deprive Plaintiffs of customers, projects, business goodwill, and reputation.

70.     Plaintiffs continue to suffer such actual and threatened losses and imminent irreparable harm from Defendants' acts.  The wrongful conduct continues to this day and presents a threat of immediate and irreparable harm to Plaintiffs, including, but not limited to, ongoing attempts to sell the Protected Business Information, including the Platform Core Data, to Plaintiffs' competitors, including Quad/Graphics, as described above.

### COUNT I - MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT, 18 U.S.C. §§ 1836, *et seq.*

71.     Plaintiffs repeat and incorporate by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

72.     The Custom Publishing Platform Core Data, including confidential source code, and database structure developed by, and/or on behalf of Plaintiffs, including but not limited to that used for the PCL, are trade secrets that derive independent economic value from not being generally known to, or not being readily ascertainable by, other persons who can obtain economic value from the disclosure or use of the information.  Plaintiffs' trade secrets provide it with a competitive business advantage.

73.     Plaintiffs took and continue to take reasonable steps to protect the secrecy of its

Platform Core Data, including by limiting access to this information and imposing

confidentiality obligations on its employees.  Plaintiffs have expended significant amounts of

effort and money to develop this trade secret information.

74.     Defendants, through the actions of Defendant Nadolinski, in breach of

Defendants' contractual obligations to Plaintiffs and without Plaintiffs' consent, have illegally

used and disclosed Plaintiffs' trade secrets, including but not limited to Platform Core Data

relating to the PCL, to develop, demonstrate, and offer for sale software products to Plaintiffs'

competitors and other third parties.

75.     At all times relevant to this Complaint, Defendants' knew or had reason to know

that Plaintiff's trade secrets and knowledge thereof were acquired by improper means, at least

because the Employment Agreements, to which the Defendants were parties, assigned all

relevant rights therein to Plaintiffs, and imposed on Defendants a duty to maintain the secrecy of

the trade secrets.

76.     Defendants' misappropriation was willful and malicious, at least because

Defendants acquired and used Plaintiffs' trade secrets with the knowledge that they did not have

any rights to the trade secrets and with the intent to cause economic harm to Plaintiffs by

offering the trade secrets to Plaintiffs' competitors.

77.     Defendants' misappropriation has resulted in damages to Plaintiffs and unjust

enrichment to Defendants in an amount to be proved at trial.  These actions have caused, and

continue to cause, irreparable harm to Plaintiffs for which Plaintiffs have no adequate remedy at

law.  As a result, Defendants should be enjoined from any further use of Plaintiffs' Platform

Core Data, Protected Business Information, or any other intellectual property and Plaintiffs'

should be awarded actual damages, including, but not limited to, all of Defendants' profits

derived from its illegal activities.  Because the information was willfully and maliciously

misappropriated, Plaintiffs should be awarded exemplary damages.

## COUNT II - MISAPPROPRIATION OF TRADE SECRETS UNDER MASSACHUSETTS GENERAL LAWS, CHAPTER 93, § 42

78.      Plaintiffs repeat and incorporate by reference the allegations contained in the

foregoing paragraphs as if fully set forth herein.

79.      The Custom Publishing Platform Core Data developed by, and on behalf of,

Plaintiffs, including but not limited to that used for the PCL, constitutes trade secret information

under Mass. Gen. Laws c. 93, § 42.

80.      Plaintiffs took and continue to take reasonable steps to protect the secrecy of this

information, including by limiting access to this information and imposing confidentiality

obligations on its employees.  Plaintiffs have expended significant amounts of effort and money

to develop this trade secret information.

81.      Defendants knowingly benefited from the use of Plaintiffs' Platform Core Data,

which were wrongfully acquired and/or retained by Defendants in breach of a confidential

relationship and contractual agreements, including the Employment Agreements.

82.      Defendants provided Plaintiffs' trade secrets to Plaintiffs' competitors and other

third parties in breach of their contractual obligations to Plaintiffs, and Defendants

misappropriated and misused Plaintiffs' trade secrets by illegally copying and/or using the

Platform Core Data and other Protected Business Information to develop, demonstrate, and offer

for sale software products to Plaintiffs' competitors and other third parties.

83.     Defendants' use of Plaintiffs' trade secrets is a violation of Mass. Gen. Laws c. 93, § 42.

84.     Defendants' misappropriation has resulted in damages to Plaintiffs and unjust enrichment to Defendants in an amount to be proved at trial.  These actions have caused, and continue to cause, irreparable harm to Plaintiffs for which Plaintiffs have no adequate remedy at law.  As a result, Defendants should be enjoined from any further use of Plaintiffs' Platform Core Data, Protected Business Information, or any other intellectual property.

## COUNT III - MISAPPROPRIATION OF TRADE SECRETS UNDER MASSACHUSETTS COMMON LAW

85.     Plaintiffs repeat and incorporate by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

86.     The Custom Publishing Platform Core Data developed by, and on behalf of, Plaintiffs, including but not limited to that used for the for the PCL, constitutes trade secret information under Massachusetts common law.

87.     Plaintiffs took and continue to take reasonable steps to protect the secrecy of this information, including by limiting access to this information and imposing confidentiality obligations on its employees.  Plaintiffs have expended significant amounts of effort and money to develop this trade secret information.

88.     Defendants knowingly benefited from the use of Plaintiffs' Platform Core Data, which were wrongfully acquired and/or retained by Defendants in breach of a confidential relationship and contractual agreements, including the Employment Agreements.

89.     Defendants provided Plaintiffs' trade secrets to Plaintiffs' competitors and other third parties in breach of their contractual obligations to Plaintiffs, and Defendants

misappropriated and misused Plaintiffs' trade secrets by illegally copying and/or using the

Platform Core Data and other Protected Business Information to develop, demonstrate, and offer

for sale software products to Plaintiffs' competitors and other third parties.

90.     Defendants' use of Plaintiffs' trade secrets is a violation of Massachusetts

common law.

91.     Defendants' misappropriation has resulted in damages to Plaintiffs and unjust

enrichment to Defendants in an amount to be proved at trial.  These actions have caused, and

continue to cause, irreparable harm to Plaintiffs for which Plaintiffs have no adequate remedy at

law.  As a result, Defendants should be enjoined from any further use of Plaintiffs' Platform

Core Data, Protected Business Information, or any other intellectual property.

## COUNT IV - UNFAIR COMPETITION UNDER MASSACHUSETTS GENERAL LAWS, CHAPTER 93A

92.     Plaintiffs repeat and incorporate by reference the allegations contained in the

foregoing paragraphs as if fully set forth herein.

93.     At all times relevant to this Complaint, Plaintiffs were business entities engaged

in trade or commerce in this Commonwealth as defined by Mass. Gen. Laws ch. 93A, §§ 2 and

11.

94.     At all times relevant to this Complaint, Defendants were business entities engaged

in trade or commerce as defined by Mass. Gen. Laws ch. 93A, §§ 2 and 11.

95.     At least the following actions by the Defendants constitute an unfair method of

competition or an unfair or deceptive act or practice:  (a) misappropriating Plaintiffs' trade

secrets and other Protected Business Information and otherwise compromising Plaintiffs'

business reputation and goodwill; (b) using those secrets and other Protected Business

Information to develop, demonstrate, and offer for sale software products to Plaintiffs'
competitors and other third parties; and (c) interfering with Plaintiffs' contractual and
advantageous business relationships with Plaintiffs' current and/or prospective customers.

96.     Defendants' unfair method of competition, and unfair or deceptive acts, as
detailed above, violate Mass. Gen. Laws ch. 93A, §§ 2 and 11.  Defendants' violations of Mass.
Gen. Laws ch. 93A, §§ 2 and 11 were knowing and willful.  Through Defendants' willful breach
of the Employment Agreements, and their knowing and willful misappropriation and use of
Plaintiffs' trade secrets for their own profit, Defendants have knowingly and willfully engaged in
unfair methods of competition and unfair or deceptive trade practices.

97.     Defendants' unfair methods of competition and unfair or deceptive acts or
practices occurred primarily and substantially within this Commonwealth within the meaning of
Mass Gen. Laws ch. 93A §§ 2 and 11.

98.     Defendants' violations of Mass. Gen. Laws ch. 93A, §§ 2 and 11 have damaged
Plaintiffs in an amount to be proved at trial.  These unfair methods of competition and unfair or
deceptive acts or practices were the direct and proximate cause of Plaintiffs' loss.  These actions
have caused, and continue to cause, irreparable harm to Plaintiffs for which Plaintiffs have no
adequate remedy at law. Plaintiffs are entitled to recover such damages, as well as enhanced
damages and the costs and attorneys' fees incurred in bringing this action.

## COUNT V - INTERFERENCE WITH ADVANTAGEOUS BUSINESS RELATIONSHIPS UNDER MASSACHUSETTS COMMON LAW

99.     Plaintiffs repeat and incorporate by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

100.     At all times material to this claim, the Defendants knew or should have known of the existence and terms of the advantageous business relationships that Plaintiffs enjoy with existing and prospective customers, and the actual contractual relationships that Plaintiffs enjoy with their existing customers as described above.

101.     Despite such knowledge, Defendants interfered with these advantageous business relationships and/or the existing contractual relationships between Plaintiffs and their existing and prospective customers, by engaging in the conduct described above.

102.     Such interference by the Defendants was intentional, malicious, without legal justification, and was conducted by unlawful methods or means for such illegal purposes.

103.     Defendants' interference with these existing and prospective relationships has resulted in damages to Plaintiffs' in an amount to be proved at trial.  These actions have caused, and continue to cause, irreparable harm to Plaintiffs for which Plaintiffs have no adequate remedy at law.

## COUNT VI – BREACH OF CONTRACT UNDER MASSACHUSETTS COMMON LAW

104.     Plaintiffs repeat and incorporate by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

105.     In exchange for valuable consideration, Plaintiffs and their predecessors in interest entered into valid, binding contractual agreements, including the Employment

Agreements: the Subcontractor Agreement, Subcontractor Amendment, IP Assignment, Employee Confidentiality Agreement, and Resignation Letter Agreement with Defendants.

106.    By virtue of the conduct described above, Defendants have violated the applicable terms of the above-referenced employment contracts for the protection of Plaintiffs' business interests, including the protection of propriety, confidential, and trade secret information, including but not limited to the Protected Business Information.

107.    Defendants' breach of these Employment Agreements has resulted in damages to Plaintiffs' in an amount to be proved at trial.  These actions have caused, and continue to cause, irreparable harm to Plaintiffs for which Plaintiffs have no adequate remedy at law.

## COUNT VII – BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING UNDER MASSACHUSETTS COMMON LAW

108.    Plaintiffs repeat and incorporate by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

109.    On multiple occasions between January 1, 2008 and January 15, 2015, Plaintiffs and their predecessors-in-interest entered into valid, binding contracts with Defendants.  Pursuant to said contracts, Plaintiffs faithfully fulfilled their covenants and conditions.

110.    Defendants perpetrated material breaches of said contracts by improperly accessing, copying, removing, and/or retaining Protected Business Information and by knowingly failing to represent Plaintiffs' interests loyally, competently, and diligently.

111.    The aforementioned contracts include covenants of good faith and fair dealings.

112.    Defendants perpetuated material breaches of the covenant of good faith and fair dealing by performing and engaging in the following acts (among others): (a) failing to abide by the terms of the aforementioned contracts; (b) improperly accessing, copying, removing, and/or

retaining Protected Business Information; (c) serving as shareholder and Chief Information

Officer of Isaak while employed by Courier without Courier's knowledge or permission; and (d)

developing, demonstrating, and offering for sale software products to Plaintiffs' competitors and

other third parties.

113.     Defendants' breach of the covenant of good faith and fair dealing has resulted in

damages to Plaintiffs in an amount to be proved at trial.  These actions have caused, and

continue to cause, irreparable harm to Plaintiffs for which Plaintiffs have no adequate remedy at

law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment against Defendants as follows:

A.     Declaring that Defendants have misappropriated Plaintiffs' trade secrets under the

Defend Trade Secrets Act 18 U.S.C. §§ 1836, *et seq.*;

B.     Declaring that Defendants have misappropriated Plaintiffs' trade secrets under

Massachusetts General Laws, Chapter 93, § 42 and Massachusetts common law;

C.     Declaring that Defendants have engaged in unfair competition under

Massachusetts General Laws, Chapter 93A;

D.     Declaring that Defendants have engaged in interference with advantageous

business relationships under Massachusetts common law;

E.     Declaring that Defendants have engaged in breach of contract and the covenant

of good faith and fair dealing under Massachusetts common law;

F.     Preliminarily and permanently enjoining Defendant Nadolinski and Defendant

NadLab, its officers, agents, servants, employees, attorneys, all parent and

subsidiary corporations and affiliates, its assigns and successors in interest, and

those persons in active concert or participation with Defendants, from any and all disclosures or uses of Plaintiffs' Protected Business Information and trade secrets;

G. Ordering Defendant Nadolinski and Defendant NadLab to remove from all distribution channels, including the Internet, and deliver up for impoundment and destruction, or show proof of destruction, of all products, documents, or other materials in the possession, custody, or under the control of Defendants that use or contain Plaintiffs' trade secrets;

H. Awarding to Plaintiffs their damages in an amount to be determined at trial, including all actual damages, statutory damages, punitive damages, and/or enhanced damages, together with appropriate interest on such damages;

I. Awarding to Plaintiffs their attorney's fees, costs and expenses, and disbursements incurred in this action;

J. Awarding to Plaintiffs such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury on all of the claims so triable.

Respectfully submitted,

ROPES & GRAY LLP

Dated: July 22, 2016                    By: /s/ Christine Ezzell Singer

Christine Ezzell Singer
(B.B.O. # 681525)
Cassandra Roth
(*pro hac vice* application pending)
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036
212-596-9000
Christine.Singer@ropesgray.com
Cassandra.Roth@ropesgray.com

Richard T. McCaulley, Jr.
(*pro hac vice* application pending)
ROPES & GRAY LLP
32nd Floor
191 North Wacker Drive
Chicago, IL 60606
312-845-1200
Richard.Mccaulley@ropesgray.com

*Attorneys for Plaintiffs*